IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 19, 2017 Session

## STATE OF TENNESSEE v. CORY LYNN WHITE

**Appeal from the Criminal Court for Anderson County**
**No. B3C00440     Donald R. Elledge, Judge**

———————————

### No. E2017-00885-CCA-R3-CD

———————————

The Defendant, Cory Lynn White, was convicted by a jury of making a false report or statement, and he received a three-year spilt confinement sentence for this conviction. The Defendant appeals, arguing (1) that there was a fatal variance between the indictment and the proof offered at trial and (2) that the evidence was insufficient to support his conviction.[1]  Following our review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Thomas Marshall, District Public Defender, for the appellant, Cory Lynn White.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; David S. Clark, District Attorney General; and Emily F. Abbott, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arose from officers' attempting to serve Skyla Lamb on November 21, 2012, with an arrest warrant for felony theft.  Based upon the Defendant's communications with law enforcement during this encounter, the Defendant was charged with making a false report or statement in violation of Tennessee Code Annotated section

———————————

[1] For the sake of clarity, we have reordered the issues as stated by the Defendant in his appellate brief.

39-16-502(a)(2)(B).  The Defendant proceeded to a jury trial that took place on February 10, 2016.

At trial, Corporal Robert Bryson with the Anderson County Sheriff's Department ("ACSD") testified that he was on patrol on November 21, 2012, when he received a be-on-the-lookout report ("BOLO") regarding Skyla Lamb.  According to Corporal Bryson, the BOLO conveyed that Ms. Lamb had been connected to a maroon Buick and that the vehicle was possibly at a 155 Coconut Lane, a residence inside a mobile home park.  Corporal Bryson proceeded to that location while "it was daytime" and found the suspect vehicle at 176, not 155, Coconut Lane.  The tag number matched the information disseminated in the BOLO, but Corporal Bryson "confirmed it with dispatch just to make sure."  Corporal Bryson also verified the warrant on Ms. Lamb.

While speaking with dispatch, Corporal Bryson saw the Defendant standing on the front porch of the mobile home, who, according to Corporal Bryson, went quickly inside when he saw Corporal Bryson "drive up."  Corporal Bryson testified that the Defendant was not inside the trailer long before exiting from the side door that "had a ramp up to it."  Although Corporal Bryson could not see the door itself, he observed the Defendant walk "down the ramp, back around, and . . . kneel[] over on the side of the ramp."  "It looked like [the Defendant] was trying to work on the bottom of the trailer[,]" as if he "was working on a piece of underpinning[.]"

Corporal Bryson, who was wearing his uniform with his badge displayed, exited his patrol car and made contact with the Defendant.  The Defendant identified himself to Corporal Bryson.  Corporal Bryson testified that he "asked [the Defendant] where Ms. Lamb was" and informed the Defendant that "she ha[d] a warrant" for her arrest.  The Defendant "said that Ms. Lamb was not there; that she had left with someone."  When the Defendant was asked who accompanied Ms. Lamb when she left the trailer, "[h]e didn't know."  Corporal Bryson stated that the following then transpired:

> I basically told [the Defendant] that we needed to make contact with [Ms. Lamb] and needed to know who she left with.  So, therefore, I asked him again if she was in there and he said: ["]No, she left with someone.["]  That's when . . . the rest of the people from the Sheriff's Office arrived . . . [to provide b]ack up[.]

ACSD Sergeant David Davis arrived while Corporal Bryson was interviewing the Defendant, and Sergeant Davis "was watching the surroundings of what was going on around" the officers.  ACSD Deputy Darrell Leach went to the back of the residence, so no one could exit through the back door without being seen.  Deputy Leach did not approach the door.

Corporal Bryson continued with his interview and asked the Defendant for a third time "if [Ms. Lamb] was in the house[.]" The Defendant again said, "No she wasn't. She left with someone." Corporal Bryson also described this third response another way—the Defendant's expressing "that [Ms. Lamb] had left and no one was there." When the Defendant was instructed that "if he lied to [the officers] and kept [them] from apprehending . . . Ms. Lamb, that he could be in trouble if he was lying that she was in the trailer[,]" he replied "that he didn't know," that "she may be in there." The Defendant also told the officers that they needed to obtain a search warrant to enter the residence. Corporal Bryson confirmed that, during the entire exchange, he never posited the precise question to the Defendant, "[I]s she in the trailer?", and the Defendant never specifically stated, "[Ms. Lamb] left with someone and hasn't come back."

Corporal Bryson described the Defendant's behavior as uncooperative, nervous, and "very erratic." Sergeant Davis opined that the Defendant seemed "evasive as [if he] didn't want to answer the questions" and that it did not appear as though the Defendant was "being truthful" with Corporal Bryson.

Deputy Leach testified that, while he was watching the back of the home, he "heard someone walking inside the home" and "messing with the doorlock[.]" Deputy Leach then radioed to the other officers and relayed what he had heard. So for safety concerns, the officers decided to detain the Defendant because they "believed that [Ms. Lamb] was in the trailer from [the Defendant's] statements and the way he was acting[,]" and they wanted to get Ms. Lamb "out as easily as" possible. After the Defendant was handcuffed, and as Officer Jeremy Baker "was walking him" to a patrol car, Ms. Lamb "came running out" of the trailer from the door "where the ramp was" "asking what [they] were] doing with [the Defendant] and where [they were] taking him." Corporal Bryson was still standing on the trailer's porch when Ms. Lamb exited. Ms. Lamb was ultimately served with the warrant, which alleged theft of property valued between $1000 to $9,999, and she was arrested.

Corporal Bryson was asked what if the Defendant had said "from the beginning" that the officers had to get a search warrant, then, according to Corporal Bryson, the Defendant would not have been arrested. Corporal Bryson explained that he "would have taken into account that [Ms. Lamb's] probably in there and tried to get her out basically." When asked how this would have been accomplished, Corporal Bryson stated, "We would have attempted to get her out without, you know, by knocking on the door or either we have the option of going and getting the search warrant in going into the prospective residence." Corporal Bryson confirmed that, in the performance of his official duties, he would have still tried to the serve the warrant on Ms. Lamb regardless of the Defendant's responses. Sergeant Davis described that they would have either tried to talk Ms. Lamb out of the trailer or "wait[ed] [her] out[.]"

According to Corporal Bryson, the Defendant did "hinder" their efforts to arrest Ms. Lamb "[b]y lying that she was not there[,]" and the Defendant was arrested once they knew he had lied about Ms. Lamb's whereabouts. Corporal Bryson maintained that he did not arrest the Defendant because the Defendant was uncooperative or because the Defendant demanded that they get a search warrant, but because the Defendant "out and out lied." According to Corporal Bryson, the Defendant admitted "on the way to the jail and when [they] got there, that his daddy told him not to let the police in." The events that took place that day were not video or audio recorded.

The Defendant called Ms. Lamb to testify on his behalf. According to Ms. Lamb, she and the Defendant were involved in a romantic relationship; she had one child by the Defendant, and another one on the way at the time of trial. Ms. Lamb testified that she lived with Defendant on Coconut Lane in November 2012 and that the couple had a "pretty big" dog at that time—"a Bull Mastiff and a pit mix."

When she learned that the police were looking for her on November 21, 2012, she left the trailer and hid in some nearby woods for approximately forty-five minutes. According to Ms. Lamb, the Defendant was not home when she left, and she had told the Defendant, prior to his departure, that she was "going to leave," although she did not tell the Defendant exactly where she was going or that anyone "was coming to get [her.]" Ms. Lamb testified that, from her vantage point in the woods, she could "see everything that was happening" at the trailer, and when she saw the Defendant's getting arrested, she returned to the residence and said, "[H]ere I am . . . , you can let him go." She averred that she never went inside the trailer after the Defendant left that day and that she did not "go up on the porch" upon her return. She "ha[d] no idea" why the officers would think that she came out of the house. Ms. Lamb said that the arrest warrant the officers served on her that day was "for missing a court date."

Ms. Lamb confirmed that she did ultimately enter a "diversionary plea" to the theft charge. Ms. Lamb also acknowledged that she was "actively trying to avoid getting arrested that day[.]" However, she testified that the Defendant "didn't know anything" other than she was leaving to go somewhere.

The Defendant testified on his behalf. The Defendant stated that he left the trailer "early that afternoon[,]" leaving to buy some beer and duct tape and to visit his mother. After hearing "throughout the trailer park everything that had been going on" that day, the Defendant said to Ms. Lamb that he "didn't want to know" and that he was leaving the residence. According to the Defendant, Ms. Lamb also said that she was leaving, but she did not tell him where she was going.

The Defendant said that, upon his return to the residence, he was followed by a police officer. According to the Defendant, he "knew they wanted something because

they sat behind [his] car," so he put his "beer inside the front door." He then took a "couple" beers with him back "outside and started taping the underpinning on [the] trailer." When asked if he saw Ms. Lamb inside the residence when he put his beers inside, the Defendant maintained, "I didn't even look, didn't even do nothing [sic]. I set my beer down and walked out. Walked right back out."

The Defendant did not remember any specific questions Corporal Bryson asked, although Corporal Bryson was treating him like "the criminal[,]" in the Defendant's opinion. The Defendant claimed that he did not lie to Corporal Bryson and told him that Ms. Lamb "left," that "she wasn't there," and that he did not "know where she" went. The Defendant said he did not believe that Ms. Lamb was in the trailer because he thought she had left. He explained, "I thought somebody did come pick her up, I didn't know what she had done. She just said she was leaving and I assumed somebody was coming to pick her up." "[I]f it was a lie," the Defendant avowed he did not know it.

The Defendant confirmed that Corporal Bryson told him that there was a warrant for Ms. Lamb's arrest, but according to the Defendant, he was not trying to keep Ms. Lamb from getting arrested by his responses to Corporal Bryson's questions. The Defendant also agreed that he said "she might be in there" when Corporal Bryson told him that he could get in trouble for lying and that he said to the officer to get a search warrant before going inside the trailer.

Following the conclusion of proof, the Defendant was found guilty as charged. The trial court sentenced the Defendant as a Range I, standard offender to three years, which sentence was suspended to supervised probation following service of four months in the county jail. The Defendant appealed, and the case is now properly before this court.

ANALYSIS

On appeal, the Defendant presents the following issues for our review: (1) whether there was a variance between the indictment and the proof at trial; and (2) whether the evidence was sufficient to support the Defendant's conviction. We will address each in turn.

I. *Fatal Variance*

The Defendant argues that he "was convicted of making a false report of which he was not accused" in the indictment. Specifically, the Defendant submits that "[i]t is clear that he was not asked the question alleged in the indictment" and that, "[b]y [the prosecution's] switching gears at trial and changing the question," a fatal variance took place between the indictment and the proof at trial, leading to a constructive amendment

-5-

to the indictment without his consent. The State responds that "the proof at trial did not substantially vary from the allegations contained in the indictment," and "it did not effectively amend an element of the offense."

As relevant here, it is a crime for any person to

[m]ake a report or statement in response to a legitimate inquiry by a law enforcement officer concerning a material fact about an offense or incident within the officer's concern, knowing that the report or statement is false and with the intent to obstruct or hinder the officer from . . . [a]pprehending or locating another person suspected of committing an offense[.]

Tenn. Code Ann. § 39-16-502(a)(2)(B). A statement is defined as "any representation of fact." Tenn. Code Ann. § 39-16-501(2). Moreover, a violation of subdivision (a)(2) is a Class D felony. Tenn. Code Ann. § 39-16-502(b)(1).

The Defendant argues that he "was forced to defend against an alleged false statement other than that charged in the indictment." Count one of the indictment alleges that the Defendant did

on or about November 21, 2012[,] . . . unlawfully[] and knowingly make a statement in response to a legitimate inquiry by Police Officer Robert Bryson concerning a material fact about an offense within the officer's concern, knowing that such statement was false and with the intent to hinder the officer from apprehending or locating Skyla Lamb, a person suspected of committing an offense, to wit: Officer Bryson did ask [the Defendant] if Skyla Lamb was present in the residence, and in reply [the Defendant] said "No, she is not here"; said false statement thus attempting to hinder the officer from arresting Skyla Lamb; in violation of T[ennessee] C[ode] A[nnotated] [section] 39-16-502(a)(2)(B).

"[A]fter an indictment has been returned, its charge may not be broadened or changed except by action of the grand jury." State v. Goodson, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001). There is a difference, however, between a constructive amendment to an indictment and a variance between the indictment and the proof:

[C]ourts [must] distinguish between constructive amendments of the indictment, which are reversible per se, and variances between indictment and proof, which are evaluated under the harmless error doctrine. The accepted test is that a constructive amendment of the indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged. . . . In

-6-

such cases, reversal is automatic, because the defendant may have been convicted on a ground not charged in the indictment. . . . If, on the other hand, the variation between proof and indictment does not effectively modify an essential element of the offense charged, "the trial court's refusal to restrict the jury charge to the words of the indictment is merely another of the flaws in trial that mar its perfection but do not prejudice the defendant."

Id. (quoting United States v. Adams, 778 F.2d 1117, 1123 (5th Cir. 1985)).

A variance arises when the proof presented at trial departs from the allegations in the indictment. State v. Keel, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). Before a variance will be deemed fatal to a prosecution, it must be both material and prejudicial. State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984); State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000). In general, a variance between an indictment and the proof at trial

is not fatal if (1) the defendant is sufficiently informed of the charges levied against him so that he can adequately prepare for trial and, (2) the defendant is protected against a subsequent prosecution for the same offense based on double jeopardy grounds. The variance is not to be regarded as material when the indictment and proof substantially correspond. A material variance occurs only if the prosecutor has attempted to rely at the trial upon theories and evidence that were not fairly embraced in the allegations made in the indictment.

State v. Mayes, 854 S.W.2d 638, 640 (Tenn.1993) (citations omitted). As long as the defendant is not misled at trial, any variance is not considered to be a basis for reversal. Johnson v. State, 596 S.W.2d 97, 103 (Tenn. Crim. App. 1979).

The specific question Corporal Bryson posed to the Defendant and the Defendant's response are not essential elements but are instead particularized details of the crime alleged. Accordingly, no constructive amendment of the indictment occurred. Moreover, generally, unless the matters alleged in the indictment are essential elements of the crime, they may be disregarded in analyzing the sufficiency of the convicting evidence. Church v. State, 333 S.W.2d 799, 809 (Tenn. 1960). And as we will discuss in the next section of this opinion, the evidence in this case was sufficient to support the Defendant's conviction.

The Defendant also relies upon State v. Leia Mellott, No. E2012-00278-CCA-R3-CD, 2013 WL 615215 (Term. Crim. App. Feb. 19, 2013), to support his material variance assertion. In Mellot, this court concluded that the State's evidence was insufficient to

-7-

prove that the defendant's responsive statement to the officer's inquiry was knowingly false and was intended to hinder their apprehension of the fugitive Vincent Boyd. 2013 WL 615215, at *5. This court reasoned that the State did not prove that the defendant's answer, "I don't know," was false as to the specific question, "[W]here is he?" and that her conviction could not "rest on speculation and the supposition that the officer's question, 'where is he?' really mean[t] 'which way did he go when he ran back inside?'" Id. Accordingly, reversal for the Mellot defendant was predicated on the insufficiency of the convicting evidence and was unrelated to any variance between any question stated in the indictment and the proof presented at trial. Mellot does not provide the Defendant with relief.

The Defendant also alleges that the variance is material because Corporal Bryson never asked the Defendant if Ms. Lamb was in the residence—the question specified in the indictment. The Defendant argues for more specificity than the law requires. The indictment described a crime under Tennessee law in that it referenced the appropriate statute for making a false report or statement, including the specific subsection alleged, and provided the Defendant with sufficient notice to prepare for trial. The Defendant knew the date of the incident and knew he was accused of making a false statement to Corporal Bryson in an attempt to hinder the apprehension of Ms. Lamb. The information contained in the indictment was sufficient to provide the Defendant with notice of the charges against him, irrespective of the particular question stated therein, and even if no question at all was provided.

Moreover, the Defendant argues that the variance is prejudicial, maintaining that "[t]he prosecution ought to at least be required to specify what question was asked and stick with that allegation." However, the fact that Corporal Bryson asked the Defendant several times about Ms. Lamb's whereabouts does not make the variance material. The unit of prosecution in subsection (a)(2) is the false statement or report made in response to a legitimate law enforcement inquiry about the same incident or offense. State v. Smith, 436 S.W.3d 751, 774 (Tenn. 2014) (vacating two of three convictions for false reporting on double jeopardy grounds because all statements involved the same incident or offense). The indictment charged events occurring on or about November 21, 2012, and referenced inquiry by Corporal Bryson specifically. In addition, there was no proof presented at the Defendant's trial that he made other statements or reports regarding a separate incident or offense. Therefore, there is no risk that the Defendant might later be charged a second time for the same offense.

Additionally, there was no proof that the prosecution relied upon theories and evidence that were not fairly embraced in the allegations made in the indictment. The evidence at trial showed that the Defendant was asked "where Ms. Lamb was," "if she was in there," and "if she was in the house," and each time the Defendant said she was

-8-

not there and had left. Corporal Bryson also described the Defendant's third response another way—his expressing "that [Ms. Lamb] had left and no one was there." The indictment charged that the Defendant told Corporal Bryson that Skyla Lamb was not present inside the residence. Because there was no variance between the indictment and the proof presented at trial, we conclude that this issue is without merit.

## II. *Sufficiency*

The Defendant maintains that the jury's verdict convicting him of making a false report or statement was not supported by the weight of the evidence. He relies on three alternative theories in support of his argument—that the evidence was insufficient to establish (1) that his responses were knowingly false, (2) that the false statement he allegedly made involved a material fact within the officer's concern, or (3) that he had the intent to hinder or obstruct the officers in apprehending Ms. Lamb. The State responds that the evidence was sufficient to support the Defendant's conviction because the jury discredited the Defendant's testimony that he believed Ms. Lamb had left the residence and had not yet returned, because the Defendant's responses were material to Corporal Bryson's questions about Ms. Lamb's whereabouts, and because the Defendant made statements with the intent to hinder the apprehension of Ms. Lamb.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

To obtain a conviction in this case, the State was required to prove the following elements: that the Defendant made a false statement in response to a legitimate inquiry by a law enforcement officer; that the statement concerned a material fact about an offense or incident within the officer's concern; and that the statement was made by the Defendant with the intent to obstruct or hinder the officer from either apprehending or locating Ms. Lamb, who was suspected of committing an offense. The proof in the light most favorable to the State established that Corporal Bryson saw the Defendant standing on the front porch of the mobile home and that the Defendant went quickly back inside upon seeing Corporal Bryson "drive up." When the Defendant exited the trailer a short time thereafter, Corporal Bryson approached the Defendant and asked "where Ms. Lamb was," also informing the Defendant that there was a warrant for Ms. Lamb's arrest. The Defendant "said that Ms. Lamb was not there; that she had left with someone." Corporal Bryson told the Defendant he "needed to make contact with [Ms. Lamb] and needed to know who she left with." The Defendant said he did not know who accompanied Ms. Lamb when she left the trailer. Corporal Bryson asked the Defendant again "if she was in there and he said: [']No, she left with someone.[']" When Corporal Bryson inquired for a third time "if [Ms. Lamb] was in the house," the Defendant said, "No she wasn't. She left with someone." Corporal Bryson described this third response another way— that the Defendant expressed to him "that [Ms. Lamb] had left and no one was there." When the Defendant was instructed that "if he lied to [the officers] and kept [them] from apprehending . . . Ms. Lamb, that he could be in trouble if he was lying that she was in the trailer[,]" he replied "that he didn't know," that "she may be in there."

The Defendant submits that the "evidence adduced at trial did not prove that any statements" he made in response to Corporal Bryson's "questions were knowingly false." He maintains that his responses to Corporal Bryson's questions that Ms. Lamb had left with someone were "consistent with [his] understanding" of the situation. The Defendant's argument is merely one of witness credibility. Again, it is within the province of the jury to decide the credibility of witnesses. See Bland, 958 S.W.2d at 659. Moreover, the fourth statement of the Defendant's that Ms. Lamb "may be in there," which came after threat of trouble if he lied, provided an inference that the Defendant knew his previous statements were untruthful. Corporal Bryson testified that the Defendant admitted "on the way to the jail and when [they] got there, that his daddy told him not to let the police in." Furthermore, Corporal Bryson described the Defendant's behavior as uncooperative, nervous, and "very erratic." Sergeant Davis opined that the Defendant seemed "evasive as [if he] didn't want to answer the questions" and that it did not appear as though the Defendant was "being truthful" with Corporal Bryson. The jury, as was their prerogative, chose to believe the officers and not the Defendant that he lacked knowledge of Ms. Lamb's whereabouts.

In a similar vein, the Defendant continues, "The lack of accurate testimony as to the questions and answers asked as well as the evidence that [the Defendant] responded to the best of his understanding results in a lack of surety beyond a reasonable doubt that he knowing[ly] responded falsely to the questions asked." However, despite the fact that the Defendant was neither asked precisely, "[I]s she in the trailer?", nor did he state specifically that "[Ms. Lamb] left with someone and ha[d]n't come back[,]" the actual questions and answers as testified to by Corporal Bryson were sufficient to establish that the Defendant was asked about Ms. Lamb's whereabouts and that the Defendant lied when he told Corporal Bryson that she was not inside the trailer and that she had left with someone. The Defendant again relies on Mellot for the proposition that "[it] is not good enough to sustain a conviction that a defendant could have given a better answer." However, the jury's verdict did not rest on speculation and supposition as it did in Mellot. See 2013 WL 615215, at *5. We conclude that a rational juror could have found beyond a reasonable doubt that the Defendant's statements were knowingly false.[2]

The Defendant also argues that his responses were not material because the officers would have been able to apprehend Ms. Lamb regardless. According to the Defendant, "[s]ince nothing [he] said was going to make any difference then the questions asked of him were not legitimate inquiry as to material facts. The only material statement [he] made was the demand for a search warrant before the deputies could enter his residence to look for Ms. Lamb." He then engages in an extensive discussion on the definition of the word material.

Material is not defined by statute in the context of this specific offense. Black's Law Dictionary, 1124 (10th ed. 2014), defines "material" to mean "[h]aving some logical connection with the consequential facts," and "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential[.]" Additionally, Webster's Third New Int'l Dictionary, 1392 (unabridged ed. 2002), as applicable, defines "material" to mean "relevant, pertinent," and "requiring serious consideration by having a certain or probable bearing on the proper determination of a law case or on some similar unsettled matter[.]" In regards to the false reporting statute, our supreme court has observed,

> The terms "material fact" and "legitimate inquiry" were discussed by the members of the legislature in committee and on the floor. The terms

---

[2] The Defendant also posits that "[t]he scary part of the statute is that sadistic prosecutors could charge any accused who pleads not guilty . . . at the initial plea and that accused later enters into a plea agreement" with making a false report under Tennessee Code Annotated section 39-16-502(a)(2). However, an accused's responses at a plea proceeding neither prevent the offense or incident from occurring or continuing to occur nor do they relate to apprehending or locating another person suspected of committing a criminal offense. The plain language of the statute does not apply in such situations.

were removed and reinserted to address members' concerns about protecting persons from charges based on peripheral facts and to prevent law enforcement from abusing its power by asking questions about a feigned criminal matter or by charging an individual under this section for a minor fact or mere misstatement. See generally Hearing on S.B. 2188 Before the S. Judiciary Comm., 100th Gen. Assemb. (Tenn. Feb. 10, 1998).

Smith, 436 at 770 n.10

Here, the Defendant thwarted the efforts of the officers to locate Ms. Lamb. The questions asked by Corporal Bryson and the answers given by the Defendant were material to determining Ms. Lamb's location, which is all that the statute requires. It does not require officers' to rely on false statements to their detriment. The Defendant is not provided a free pass to lie to the police while they are attempting to serve a warrant simply because there may have been other legal means to enter the trailer or the officers could have waited for Ms. Lamb to emerge. Both of those avenues would have taken additional time. In addition, the fallacy in the Defendant's argument is further evidenced by his assertion that, "since no answer by [him] was going to be material or make any difference, the inquiry itself was not legitimate." Certainly when officers have a warrant for a suspect's arrest, and that suspect was connected with a certain vehicle that was found at a specific residence, any questions to persons present on that same property concerning the suspect's whereabouts are indeed legitimate. Contrary to the Defendant's assertion, this was not a case of a conviction "based on peripheral facts," "feigned criminal matters," or "based on a minor fact or mere misstatement."

Finally, the Defendant submits that the State failed to prove he had the intent to obstruct or hinder the officers from apprehending Ms. Lamb; rather, in fact, all he "intended was for the deputies to obtain a search warrant before entering his home." According to the Defendant, it was "the invocation of [his] constitutional right to be free from home invasion absent probable cause and a warrant" that "led to his arrest and prosecution." However, the Defendant's contention is based upon the misconception that his responses did not "make any difference" to the officers in locating Ms. Lamb; a premise we have concluded lacks merit.

Moreover, "intent can rarely be shown by direct proof and must, necessarily, be shown by circumstantial evidence." Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973). Corporal Bryson saw the Defendant go inside the trailer quickly once seeing Corporal Bryson "drive up." The Defendant's own testimony indicated that he knew the police were looking for Ms. Lamb, and Corporal Bryson testified the he informed the Defendant that there was a warrant for Ms. Lamb's arrest. Deputy Leach heard footsteps inside the mobile home and someone fiddle with the "doorlock." According to Corporal Bryson, the Defendant did "hinder" their efforts to arrest Ms. Lamb "[b]y lying that she was not

there[,]" and the Defendant was only detained initially for the officers' safety. Corporal Bryson maintained that he did not arrest the Defendant because he was uncooperative or because the Defendant demanded that they get a search warrant, but because the Defendant "out and out lied" about Ms. Lamb's whereabouts. The evidence need only show that the Defendant intended to obstruct the officers, not that he was successful in doing so. A rational juror was free to disbelieve the Defendant and conclude that he knew Ms. Lamb was inside the trailer and that he told the police she was not there in an attempt to hinder the officers from locating and apprehending her.

In light of the foregoing, we conclude that the evidence was sufficient to support the Defendant's conviction for making a false report or statement. See, e.g., Smith, 436 S.W.3d 772-73 (holding that the evidence was sufficient when the defendant made various false statements throughout an investigation into the defendant's report that his wife was missing because the jury reasonably could have inferred that the statements were false and were made with the intent to obstruct or hinder officer from preventing the offense or incident from continuing to occur); State v. Alice Irene Thomas, No. W2005-00428-CCA-R3-CD, 2005 WL 3333387, at *4 (Tenn. Crim. App. Dec. 7, 2005); (affirming sufficiency of the evidence for making a false report because a reasonable juror could have concluded that the defendant informed her son that the victim had money and knew he was going to rob the victim and because the jury also could have concluded that the defendant knowingly lied to an officer when she told him that she did not know who committed the robbery; reasoning that "the robber's identity was a material fact" and rejecting the defendant's argument that, because the robber had been identified and the police "knew all about what happened[,]" it "would then be factually and legally impossible to intentionally obstruct or hinder an officer" from apprehending the robber); State v. Mary Margaret Boyd, M2004-00580-CCA-R3-CD, 2005 WL 885091, at *2 (Tenn. Crim. App. Apr. 15, 2005) (concluding that the evidence was sufficient to support defendant's false reporting conviction where the proof showed that, after a car accident, the defendant intended to thwart officers in the pursuit of the actual driver by claiming that she was the driver and threatening witnesses on the scene that she would kill them if they did not say she was the driver); State v. Jeffery A. Pack, No. M2003-01431-CCA-R3-CD, 2004 WL 343970, at *4-5 (Tenn. Crim. App. Feb. 24, 2004) (upholding false reporting conviction where officers were attempting to serve probation violation warrants on a fugitive, who was ultimately located inside the defendant's trailer, but the defendant, who was a known associate of the fugitive's, twice denied having any knowledge of the fugitive's whereabouts in response to the officers' inquiries; "[t]he jury was eminently entitled to accept the State's evidence that the defendant's responsive statements to the officers' inquiries were knowingly false and were intended to hinder the apprehension of the fugitive"). Relying on these similar examples, we conclude that the Defendant is not entitled to relief.

-13-

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE